Alfonso GAINES, Plaintiff in Error,

v.

The STATE of Oklahoma, Defendant in Error.

No. A–16059.

Court of Criminal Appeals of Oklahoma.

Jan. 12, 1972.

Rehearing Denied Feb. 28, 1972.

Andrew T. Dalton, Jr., Appellate Public Defender, Tulsa, for plaintiff in error.

Larry Derryberry, Atty. Gen., Raymond Naifeh, Asst. Atty. Gen., for defendant in error.

BUSSEY, Presiding Judge.

Alfonso Gaines, hereinafter referred to as defendant, was charged in the District Court of Tulsa County, Oklahoma, with the offense of Murder, wherein at the trial the jury returned a verdict finding the defendant guilty of First Degree Manslaughter. His punishment was fixed at a term of not less than thirty (30) years, nor more than ninety (90) years imprisonment, and from said judgment and sentence, a timely appeal has been perfected to this Court.

At the trial, Woodrow Franks testified that he lived at 3725 West 53rd Street in Tulsa County, Oklahoma. On May 30, 1968, he had invited several friends to a barbeque party. He testified that the party was in progress when at approximately 4:00 o'clock in the afternoon, he observed the defendant walk into his yard. He testified that the defendant walked over to where Mae Francis Williams and Charles Henderson, the victim, were sitting. Mae asked the defendant something, wherein the defendant stated, "You haven't heard me say nothing about going home." The next thing he heard was Mae say, "Look out, he has got a gun." He next observed Henderson running out the front gate and Gaines, the defendant, jumped over the fence. He heard two shots fired, but did not see who shot the gun. As the shots were fired, he observed Henderson running east on 53rd, and the defendant was running south.

John Gill testified that he was at the home of Woodrow Franks on the day in question. He testified that there were various persons at the party in Franks' yard, including Henderson, John Brown, John Burden, William Brown and Mae Francis. He testified that he first ob-

served the defendant at approximately 9:30 p. m. The defendant walked up to where Mae Francis, who presumably was the defendant's commonlaw wife, was sitting. Mae asked the defendant something like if he was ready to go home, and the defendant replied, "I didn't say anything about going home, did I." Presuming there was going to be some trouble between Mae and the defendant, he moved over to another part of the yard. He heard some unusual commotion and looked around and observed the defendant with some liquid or something on his face and Charles Henderson had a beer can raised "rather high to be drinking it." He next observed the defendant going in a backward motion toward the big bush and Henderson moving toward the gate. He next heard two shots, but did not see anybody shoot a gun. Some fifteen to twenty minutes later, after searching for Charles Henderson, he was found lying in a yard some three quarters of a block away from Franks' house.

Officer Helm testified that he arrived at the scene at approximately 10:02 p. m., and observed Henderson lying in the yard. He checked Henderson and found no evidence of breathing or any heart beat. He testified concerning certain photographs that were taken at the scene.

John Brown testified that he arrived at Franks' house at approximately 4:30 in the afternoon to attend a barbeque party. He testified that other persons arrived during the course of the afternoon and early evening. Somewhere between 8:00 o'clock and 9:00 o'clock, he observed the defendant come through a small gate and walk up to where he was standing. Mae Francis was sitting on his lap and Charles Henderson was sitting on his right. Defendant began to stare at him, and he asked the defendant what he was staring at, but the defendant did not answer. Mae asked the defendant if he was ready to go home, and the defendant then cursed her. Henderson asked Brown if he was afraid of the defendant, and the defendant uttered an obscenity and asked him what he had to do with it. The defendant then backed off from Henderson

and ran his hand into his pocket. Mae Francis said, "He has got a gun." Henderson pitched the beer at the defendant and tried to grab him, and failing to do so, Henderson broke and ran. The defendant fired at Henderson when he was approximately four to five feet away. Henderson proceeded out the gate and the defendant jumped the fence to cut Henderson off. He testified that he heard further shots after defendant jumped the fence.

William Brown testified that he arrived at the Franks' party at approximately 6:30 p. m. He testified that he observed the defendant arrive somewhere between 8:00 o'clock and 9:00 o'clock. He testified that he was not paying too much attention, but that the defendant went directly to meet Mae Francis and he heard her say, "look out, he has a gun, and then boom." He testified that he jumped and moved, and by the time he turned around, Charles Henderson ran past him and out the gate. He testified that two shots were fired while Henderson was inside the yard and that he observed the defendant fire two shots after Henderson was running past the gate. He testified that the grass in the area where the defendant jumped the fence was about waist high.

Francis Williams testified that there were about ten people at the Franks' house when she arrived. At approximately 9:00 o'clock the defendant arrived and she asked Gaines if he was ready to go; he replied that he had not said anything about going yet. She heard John Brown ask the defendant why he was staring at him, wherein Henderson interceded in the dialogue. The defendant told Henderson that he was not talking to him. Henderson then attempted to hit the defendant and the defendant turned and ran into some bushes. She testified that she said, "Stop, Charles, or he will shoot," and the next thing she heard was two shots. She testified that she did not see the defendant shoot a pistol or have a pistol on his person. She testified that she and the defendant were living together and that they were not married.

Deputy Perkins testified that at approximately 2:00 o'clock a. m., on May 31, 1968, the defendant came to the Tulsa County Sheriff's office. The defendant stated, "I think you are looking for me," and turned over a .32 caliber automatic weapon to him. The party therein stipulated that if the FBI expert witnesses were called, they would testify that the two .32 caliber bullets which were taken from the deceased were fired from the pistol that was introduced into evidence.

Dr. Lowbeer testified that he performed an autopsy on the body of Charles Henderson. He testified that there were two gunshot wounds, in the right abdomen and the second in the back. He further testified that the second was fired in a downward direction. He testified that the cause of death was a bullet that entered the heart. He testified that although a shot through the heart was rapidly fatal, "it may not have prevented the man to run a block, as he allegedly did before collapsing." (Tr. 365) He testified, as did previous witnesses, that the deceased was a large man, standing over six feet tall and weighing somewhere between 250 and 300 pounds.

For the defense, the defendant testified that he was twenty-six (26) years old, and on the afternoon of May 30, 1968, he played cards at Jewel Antwine's house. Sometime that afternoon, Charles Henderson came to the Antwine house and made a few wise cracks or remarks toward him. That evening he went to Woodrow Franks' house to get Mae Williams to see if she wanted to go with him to Sapulpa. As he approached where she was sitting, he observed Charles Henderson and John Brown in the near vicinity. He engaged in a conversation with John Brown, wherein Henderson interrupted and attempted to start a fight. He asked Henderson, "What are you doing trying to start something?" Henderson stated, "I'll show you what I've got to do with it," and threw a can of beer at him. The beer spewed in defendant's face and got into his eyes. He started backing up and someone hit him behind the

head. He could not see very well and attempted to run through the gate, and instead ran into a tree. He then attempted to jump over the fence, and in the process, got his foot hung on the fence. He then observed Henderson coming from his car with a gun. Henderson struck at his head with the gun and struck him along the shoulder. The gun fell to the ground, wherein the defendant picked up the gun, and fired two shots. He testified that he did not know if he had struck Henderson and that he ran away because he was frightened of what John Brown and his brother might do to him. He testified that he wandered for a while, rode a boxcar for a short distance, and after making telephone calls attempting to find out what had happened, he turned himself in to the sheriff's office. On cross examination, he testified that he had been living with Mae Williams for approximately one year, and that he was not married. He testified that he had not had prior difficulties with Henderson, but on one occasion, John Brown had mistreated Mae. He testified that the area where he jumped the fence there was not grass, just bare ground. He testified that he really did not know what position the victim was in when he fired the pistol, although he was somewhat close. He denied owning a pistol or bringing the pistol in question to the party.

Elnora Antwine testified that the defendant had been at her house earlier in the afternoon playing cards. Henderson and John Brown came to the house and subsequently left after she had asked them two or three times to leave. She testified that she did not see a weapon on the defendant's person at any time at the house nor when he left.

■ The first two propositions assert that the trial court erred in giving a "good-time credit" instruction, and that as a result of the instruction, the punishment is excessive. These propositions are well-taken, in that we have repeatedly held that it is error to instruct the jury in accordance with Title 57 O.S., § 138. We note that in the instant case, the instruction was given after a determination of defendant's guilt in the second stage of a two-stage proceeding, and as such, does not constitute reversible error. Williams v. State, Okl.Cr., 461 P.2d 997.

The third proposition contends that "the evidence of the State is insufficient to support the verdict, in that standing alone it is inconsistent on the one hand with guilt, and on the other hand, with innocence. We are of the opinion that the evidence, if believed, was sufficient to support the verdict of the jury. In Humphrey v. State, Okl.Cr., 452 P.2d 590, we stated:

"The credibility of the witnesses and the weight and value to be given their testimony is within the exclusive province of the jury to determine, and the jury may believe the evidence of a single witness upon a question of fact and disbelieve several others testifying to the contrary."

We have consistently held that where there is competent evidence in the Record from which the jury could reasonably conclude that the defendant is guilty as charged, the Court of Criminal Appeals will not interfere with the verdict, even though there is a sharp conflict in the evidence and different inferences may be drawn therefrom, since it is the exclusive province of the jury to weigh the evidence and to determine the facts.

■ The final proposition asserts that the trial court erred in instructing the jury as to flight. We need only to observe that (1) the defendant did not object to the instruction, and (2) that the identical instruction concerning the flight has been approved by this Court in the case of Pyles v. State, Okl.Cr., 483 P.2d 1185. We, therefore, find this proposition to be without merit.

In conclusion, we are of the opinion that because of the giving of the "good-time credit" instruction that justice would best be served by modifying the judgment and sentence to a term of not less than twenty

(20) years, nor more than sixty (60) years, and as so modified, the judgment and sentence is affirmed.

BRETT and SIMMS, JJ., concur.